Quenton L. ELDERS, Jr., Appellant

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2011–CA–000299–MR.

Court of Appeals of Kentucky.

Aug. 17, 2012.

Discretionary Review Denied by Supreme
Court April 17, 2013.

Emily Holt Rhorer, Assistant Public Advocate, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, M. Brandon Roberts, Assistant Attorney General, Frankfort, KY, for appellee.

Before ACREE, Chief Judge; CLAYTON and KELLER, Judges.

## OPINION

KELLER, Judge:

Quenton L. Elders, Jr. (Elders) appeals from an order of the Jefferson Circuit

Court denying his motion to suppress. Elders also appeals from the Jefferson Circuit Court's judgment convicting him of one count of sodomy and/or rape in the third degree, one count of distribution of obscene matter to minors, and of being a persistent felony offender in the second degree. For the following reasons, we affirm.

## FACTS

In December 2008, Elders was indicted by a Jefferson County Grand Jury on two counts of first-degree rape, two counts of first-degree sodomy, first-degree unlawful transaction with a minor, possession of a handgun by a convicted felon, promoting prostitution, and distribution of obscene matter to a minor. With the exception of the possession of a handgun by a convicted felon charge,[1] all of these charges involved a fourteen-year-old girl, A.H.

Prior to trial, Elders moved to suppress evidence, and the trial court denied that motion. A trial was subsequently held on September 28–30, 2011. The witnesses presented diverse versions of the facts in this matter. Therefore, we summarize their testimony below.

### 1. A.H.'s Testimony

In late August or early September 2008, A.H. noticed a missed call notification on her cell phone. When she returned the call, Elders answered. Although she did not know Elders, A.H. spoke with him and told him that she was fourteen years old when he asked her age. When Elders asked her if she wanted to make some money, A.H. responded that she did, and the two agreed to meet the next day in a church parking lot.

After meeting in the parking lot, the two went to an apartment building on West Jefferson Street in Louisville, Kentucky. While A.H. waited in Elders's car, he went into the building and returned with two bags of clothes and a video camera.

The two then went to another apartment that was located above a t-shirt shop on South 28th Street in Louisville. While in that apartment, A.H. tried on some of the "skimpy" clothes that Elders had brought in the bags. Elders then explained to A.H. she could work for him as a prostitute and that he would take half of any money she earned. The two then engaged in sexual activity.

After their sexual encounters, Elders showed A.H. videos he had on his video camera so she could see what she was supposed to do. The videos showed women walking in dresses and high heels through Shawnee Park and performing oral sex on Elders. After they watched the videos, Elders took A.H. to Shawnee Park where she walked around in a "skimpy" dress while Elders videotaped her. They then left the park and Elders returned A.H. to the church parking lot.

After this initial encounter, A.H. began working as a prostitute for Elders, who scheduled customers to meet A.H. at the South 28th Street apartment. During August or September 2008, A.H. had sex with approximately ten men. Elders collected all of the money, which, despite their agreement, he did not share with A.H.

### 2. Cross's Testimony

Romeo Cross (Cross) testified that: he occupied the entire building on South 28th Street; he owned and operated the t-shirt shop on the bottom floor of that building; and leased the apartments on the top floor. Cross had known Elders for approximately five years, and had leased an apartment to Elders's brother. However, Elders's

---

1. This count was severed prior to trial and is not relevant to this appeal.

brother had moved out, and the apartments were vacant during August and September 2008. Cross kept the outside door that led to the apartments locked, and he kept the only key. Cross never saw a young girl visiting the apartments.

### 3. Detective Crowell's Testimony

Detective Timothy Crowell (Detective Crowell), the lead detective in this case, testified that, in November 2008, he observed a forensic interview of A.H. by Rebecca League with Family and Children First. During the interview, A.H. revealed that she had a sexual encounter with Elders and that she had engaged in prostitution. Based on A.H.'s interview, Detective Crowell sought search warrants for the following addresses: (1) 2413 West Jefferson Street, the apartment where A.H. alleged Elders retrieved the camera and bags of "skimpy" clothes; (2) 1025 South 28th Street, the apartment in which A.H. alleged she engaged in sexual activity with Elders and engaged in prostitution; and (3) 2343 West Madison Street, the apartment in which Elders resided with his mother. The warrants were issued simultaneously on November 20, 2008. Detective Crowell testified that the video camera, videotapes, and "skimpy" clothes were found at Elders's residence. No evidence of the alleged crimes was found at the other two addresses.

### 4. Elders's Testimony

According to Elders, A.H. called him, they discussed sex, and they agreed to meet at the parking lot of the Family Dollar store across from the South 28th Street apartment. When the two met, A.H. told Elders that she was a prostitute and was working for a "pimp." Elders, who thought A.H. was sixteen or seventeen years old, did not ask A.H. her age.

The two went to the t-shirt shop in the South 28th Street building and got the key for an apartment in the building from Cross. Elders and A.H. then went to the apartment where Elders was storing his video camera, videos, and some clothing that belonged to his girlfriend, Kela Lumpkins (Lumpkins). While they were in the apartment, Lumpkins called Elders on his cell phone, and he went into a room away from A.H. to speak with Lumpkins. When he returned to the room that A.H. was in, A.H. had his video camera. Elders was unsure whether A.H. watched a video of him and Lumpkins engaging in sexual activity. When Elders returned, A.H. then asked him if they were going to make a video, and she began looking through Lumpkins's clothes. However, she did not try on any of the clothes, and Elders did not ask her to do so. Shortly thereafter, Elders took a box with Lumpkins's clothes, the video camera, and the videos, and the two left the apartment. A.H. asked Elders to drive her to a church parking lot, which he did.

Elders stated that he only saw A.H. on that one occasion, that he did not arrange for her to engage in prostitution, and that he did not take money from anyone in exchange for A.H.'s sexual favors. However, Elders did admit that he spoke with A.H. twice after their only meeting.

### 5. Lumpkins's Testimony

Lumpkins testified that she had been Elders's girlfriend for six years; that she was the woman on the video found by A.H.; and that she was not a prostitute and had never been a prostitute.

At the close of the Commonwealth's case, Elders moved for a directed verdict. Finding no evidence of forcible compulsion, the trial court dismissed one count of first-degree sodomy and one count of first-degree rape.

The jury was instructed on one count of first-degree sodomy; one count of first-degree rape; one count of first-degree unlawful transaction with a minor; one count of third-degree sodomy and/or third-degree rape; one count of promoting prostitution; and one count of distribution of obscene matter to minors. The jury found Elders guilty of third-degree sodomy and/or rape and of distribution of obscene matter to minors. The jury also found Elders guilty of being a persistent felony offender in the second degree. Consistent with the jury's recommendation, the trial court sentenced Elders to seven and a half years' imprisonment.

Additional facts are set forth as necessary below.

## STANDARDS OF REVIEW

The issues raised on appeal have differing standards of review. Therefore, we apply the appropriate standard of review as we address each issue.

## ANALYSIS

### 1. Suppression

On appeal, Elders first contends that the trial court erred in denying his motion to suppress evidence seized from his residence. Specifically, Elders contends that there was no probable cause for a search of that address because there was no nexus between the evidence sought and Elders's residence. We disagree.

As set forth above, on November 20, 2008, Detective Crowell executed an affidavit for a search warrant of Elders's residence based on information he received almost exclusively from A.H. In pertinent part, the affidavit alleged that, between July and September 2008, at a location other than his residence, Elders used his video camera to show A.H. several videos of other females modeling erotic clothing and performing sex acts with him. Elders also allegedly videotaped A.H. wearing erotic clothing and engaging in oral sex with him, and coerced her into prostituting herself with ten different individuals at a location other than his residence. The affidavit listed the following items to be seized:

Any video cameras, digital video cameras, video cassettes, digital cameras, DVD's or other media that can record or store recorded images. Any erotic women's clothing or lingerie, women's shoes and any plastic bags containing women's erotic clothing or lingerie....

The only connection the affidavit establishes between the alleged crimes and Elders's residence is the following statement: "Victim stated that she did not think Mr. Elders lived at 2413 W. Jefferson where he picked up the video camera and clothes from [sic] and stated that he took the camera with him, possibly to his home, after he had finished videotaping her with it." The video camera, video cassettes, and erotic women's clothing were discovered at Elders's residence.

 The Fourth Amendment of the U.S. Constitution and Section 10 of the Kentucky Constitution mandate that no warrant shall be issued without probable cause. As set forth in *Moore v. Commonwealth,* 159 S.W.3d 325, 329 (Ky.2005):

Our review of a search warrant must give great deference to the warrant-issuing judge's findings of probable cause and should not be reversed unless arbitrarily exercised. Courts should review the sufficiency of an affidavit underlying a search warrant in a commonsense, rather than hypertechnical, manner. The traditional standard for reviewing an issuing judge's finding of probable cause has been that so long as the magistrate had a substantial basis for con-

cluding that a search warrant would uncover evidence of wrongdoing, the Fourth Amendment requires no more. Whether probable cause exists is determined by examining the totality of the circumstances. Furthermore, the test for probable cause is whether there is a fair probability that contraband or evidence of a crime will be found in a particular place. Probable cause does not require certainty that a crime has been committed or that evidence will be present in the place to be searched. (Citations omitted).

Elders contends that the affidavit for the search warrant in this case failed to provide a "nexus between the place to be searched and the evidence sought." *United ed States v. Carpenter*, 360 F.3d 591, 594 (6th Cir.2004) (citation omitted). He contends that the affidavit was completely lacking in facts connecting his residence to his alleged activities.

In support of his argument, Elders cites to *Guth v. Commonwealth*, 29 S.W.3d 809 (Ky.App.2000). In that case, a search warrant was issued for Guth's residence based upon an affidavit that stated Guth sold cocaine to a man for $200 "in a controlled environment[.]" *Id.* at 810. This Court held that the affidavit was invalid on its face because it "neither alleged that the controlled environment was Guth's residence nor did it allege any connection between the place where the transaction took place and the residence." *Id.* at 811. In fact, the drug transaction took place in a motel parking lot some four or five miles from Guth's residence. *Id.* at 810.

The Commonwealth contends that, unlike in *Guth*, there was a nexus between the place searched and the alleged crimes, and that this case is similar to *Moore*, 159 S.W.3d 325 and *Beckam v. Commonwealth*, 284 S.W.3d 547 (Ky.App.2009). In *Moore*, a search warrant for Moore's residence was granted based upon an affidavit alleging that Moore had opened a bank account using fraudulent information and had made two fraudulent car purchases through the account scam. The Supreme Court of Kentucky upheld the warrant, reasoning:

> The bank-informant described at least one of the instruments used to fund the account as a "computer generated check".... [I]t is known from this fact alone that a computer was used to make the instrument. It was highly likely that Moore used a computer or similar machine in the secrecy of his home. Thus, such a description of the instrument and the certainty that Moore was passing the instruments gave information that provided a nexus between the crime and the place.

*Moore*, 159 S.W.3d at 330.

In *Beckam*, a car dealership owner contacted the Kentucky State Police regarding Beckam, who rented several vehicles from the dealer over a period of several weeks. The car dealer reported suspicious findings in the returned vehicles. The investigating trooper took field samples of alleged marijuana residue in one of the vehicles and received a positive result. The trooper also found a set of electronic scales in one of the vehicles. After investigating the rental cars, the trooper ran a background check and discovered that Beckam and his wife had criminal records for drug-related offenses. After confirming Beckam's address with the rental car information, he requested a search warrant. The warrant was executed and many items were seized resulting in an indictment. Before trial, Beckam asserted the affidavit was insufficient and moved to suppress all evidence obtained as a result of the search. 284 S.W.3d at 549.

This Court addressed whether the affidavit provided "a sufficient nexus for authorizing a warrant to search [Beckam's] residence." *Id.* The court found persuasive a federal case, *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir. 1999), which held, " 'in issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept, based on the nature of the evidence and the type of offense, and that in the case of drug dealers evidence is likely to be found where the dealers live.' " *Id.* at 550 (quoting *United States v. Reddrick*, 90 F.3d 1276, 1281 (7th Cir.1996)).

■ We believe that, as in *Moore* and *Beckam*, the issuing judge could draw reasonable inferences about the video camera, videotapes, and erotic female clothing, and draw reasonable inferences about where it was likely to be kept—Elders's residence. In fact, in this case, the affidavit presented to the issuing judge provided that A.H. told Detective Crowell that Elders took the video camera with him, "possibly to his home." Therefore, we believe there was a sufficient nexus between the place to be searched and the evidence sought. Accordingly, probable cause supported the issuance of the warrant in this case.

Even if probable cause did not support the issuance of the warrant, the evidence found at Elders's residence would be admissible pursuant to the good-faith exception to the exclusionary rule set out in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and adopted in *Crayton v. Commonwealth*, 846 S.W.2d 684 (Ky.1992). As stated in *Hensley v. Commonwealth*, 248 S.W.3d 572, 577 (Ky.App.2007):

Historically, a violation of the Fourth Amendment required the automatic suppression of the evidence seized. However, in *Leon, supra*, the Supreme Court

reversed this *per se* suppression rule and added what we know today as the "good faith exception." The Supreme Court in *Leon* held an officer's reasonable reliance on a search warrant issued by a neutral and detached magistrate could save evidence from being excluded when the warrant was later determined to be deficient for lack of probable cause. However, the Court went on to add that if the magistrate had been misled with false information, any evidence seized should be suppressed as the officer's reliance on the search warrant could not be seen as reasonable. Further, if the magistrate abandons the "detached and neutral" judicial role or if the officer's belief in the existence of probable cause was wholly unreasonable, suppression of evidence remains available as a remedy.

■ In this case, the issuing judge was not misled with false information. Further, neither party has suggested that the issuing judge abandoned his or her "detached and neutral" judicial role. Moreover, Detective Crowell's belief in the existence of probable cause for the search was not wholly unreasonable. As stated in *Beckam*, 284 S.W.3d at 551:

Were we to have relied upon *Guth* as opposed to *Moore* and the weight of the federal cases, we could not have held that the officer's belief in the existence of probable cause below was wholly unreasonable. *See* 29 Am.Jur.2d *Evidence* § 616 (2008) ("[w]here evidence is sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause, it cannot be said that police officers who provide a truthful affidavit to a neutral magistrate who then issues a warrant are not objectively reasonable in believing that they have probable cause").

Therefore, we conclude that, even if probable cause did not support the issuance of the warrant, the evidence found at Elders's residence would be admissible pursuant to the good-faith exception. Accordingly, we conclude that the trial court did not err in denying Elders's motion to suppress.

## 2. Jury Deliberations

Next, Elders argues that he was substantially prejudiced and denied due process of law when the trial court gave a substantive instruction to the jury and continued deliberations. Elders contends that the trial court should have given a charge pursuant to Kentucky Rule of Criminal Procedure (RCr) 9.57(1) after the jury indicated it could not come to an agreement on a count. We disagree.

Elders requested that a third-degree rape and/or sodomy instruction be given as a lessor included instruction to the first-degree unlawful transaction with a minor, and the trial court agreed. Therefore, the jury was presented with the following instructions:

### INSTRUCTION NO. 3
### UNLAWFUL TRANSACTION WITH A MINOR IN THE FIRST DEGREE

You will find the Defendant, Quenton L. Elders, Jr., guilty under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

(A) That in Jefferson County, Kentucky, between August, 2008, and September, 2008, the Defendant knowingly induced, assisted, or caused [A.H.] to engage in illegal sexual activity;

(B) That [A.H.] was less than 16 years of age;

AND

(C) That the Defendant knew [A.H.] was less than 16 years of age.

Once you have decided whether the Defendant is guilty or not guilty under this Instruction, you shall complete Verdict Form No. 3. If you find the Defendant not guilty, you shall proceed to Instruction No. 4. Otherwise, proceed to Instruction No. 6.

### INSTRUCTION NO. 4
### SODOMY IN THE THIRD DEGREE AND/OR RAPE IN THE THIRD DEGREE

If you do not find the Defendant, Quenton L. Elders, Jr., guilty under Instruction No. 3, you will find the Defendant guilty of Sodomy in the Third Degree and/or Rape in the Third Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt, all of the following:

(A) That in Jefferson County, Kentucky, between August 2008, and September, 2008, the Defendant engaged in deviate sexual intercourse and/or sexual intercourse with [A.H.];

AND

(B) That at the time of such intercourse, the Defendant was 21 years of age or older and [A.H.] was less than 16 years of age.

Once you have decided whether Defendant is guilty or not guilty under this Instruction, you shall complete Verdict Form No. 4.

### INSTRUCTION NO. 5
### DEFENSE TO SODOMY IN THE THIRD DEGREE
### AND RAPE IN THE THIRD DEGREE

Although you may believe from the evidence beyond a reasonable doubt under Instruction No. 4 that the Defendant, Quenton L. Elders, Jr., engaged in devi-

ate sexual intercourse and/or sexual intercourse with [A.H.], and that [A.H.] was then less than 16 years of age, if you believe from the evidence that he did not know she was less than 16 years of age, you shall find him not guilty under Instruction No. 4.

After deliberating for more than three hours, the jury sent a note to the judge indicating some confusion with the jury instructions. Specifically, the jury asked, "Can someone explain how Instruction No. 5 make [sic] Instruction No. 4 the same as Instruction No. 3?" Upon agreement of the parties, the court sent the following note to the jury: "Please reread the instructions. Thank you."

Approximately thirty minutes later, the jury sent out a note stating, "We can't come to an agreement on 3 & 4." The trial court stated that it believed three options were available: (1) they could give the jury an *Allen*[2] charge and ask that they continue to deliberate; (2) let them go home for the evening and renew deliberations in the morning; or (3) they could call them in and try to explain Instructions No. 3 and No. 4. The trial court proposed to tell the jury that it could find the defendant guilty under Instruction No. 3, or guilty under Instruction No. 4, or not guilty under both No. 3 and No. 4; and it could not get to No. 4 unless it found the defendant not guilty under No. 3. The trial court observed that the jury's note implied that they were trying to resolve both instructions at the same time.

The Commonwealth agreed with the trial court's proposed explanation of Instruc-

tions No. 3 and No. 4. Elders objected to any explanation of the instructions to the jury, because it was unknown whether the jury was confused if they could convict under both Instructions or if there were some people who would vote under No. 3, and others who would vote under No. 4. Therefore, Elders proposed that the jury be brought in and that the trial court ask if further deliberations would assist them. The trial court overruled Elders's objection. It then brought the jury back into the courtroom and told them that it was going to send them home for the evening and bring them back in the morning. The court then read the following instruction to the jury:

> You can find the Defendant guilty under Instruction No. 3, or you can find him guilty under Instruction No. 4, or you can find him not guilty under Instruction No. 3 and Instruction No. 4. You do not get to Instruction No. 4—you don't reach Instruction No. 4—unless you find that he is not guilty under Instruction No. 3. And you don't get to Instruction No. 5, either, unless you find him not guilty under Instruction No. 3.

The jury returned the next morning and, after deliberating for more than two hours, acquitted Elders of all counts except sodomy and/or rape in the third degree (Instruction No. 4) and distribution of obscene matter to a minor. Elders now contends that the trial court's instruction did not comply with RCr 9.57(1), and that it was coercive.

RCr 9.57(1) provides that:

**2.** We note that the *"Allen* charge" referred to by the trial court in this case stems from *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), wherein the United States Supreme Court approved a set of lengthy instructions given to a deadlocked jury. *Id.* at 501–02, 17 S.Ct. at 157. While

the *"Allen* charge" enjoyed a period of acceptance in this Commonwealth, *Earl v. Commonwealth,* 569 S.W.2d 686, 688 (Ky.App. 1978), the wide discretion previously afforded to trial judges in instructing deadlocked juries has since been superseded by RCr 9.57(1).

If a jury reports to a court that it *is unable to reach a verdict* and the court determines further deliberations may be useful, the court *shall not give any instruction regarding the desirability of reaching a verdict* other than one which contains only the following elements:
(a) in order to return a verdict, each juror must agree to that verdict;
(b) jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
(c) each juror must decide the case, but only after an impartial consideration of the evidence with the other jurors;
(d) in the course of deliberations, a juror should not hesitate to reexamine his or her own views and change his or her opinion if convinced it is erroneous; and
(e) no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors, or for the mere purpose of returning a verdict.

(Emphasis added).

 We note that RCr 9.57(1) requires the jury to be deadlocked. *See Bell v. Commonwealth,* 245 S.W.3d 738, 742 (Ky. 2008), *overruled on other grounds by Harp v. Commonwealth,* 266 S.W.3d 813 (Ky. 2008). Similar to *Martin v. Commonwealth,* 170 S.W.3d 374, 383 (Ky.2005), the jury was only divided in this case. In *Martin,* the trial court ordered the jury to return to deliberations after the jury wrote a note stating it could not come to a unanimous vote on the sodomy count and asked for additional instruction. In analyzing RCr 9.57(1), the Supreme Court of Kentucky concluded that the trial court did not err in ordering the jury to return to deliberations, because the jury had only indicated it was "divided, not deadlocked." *Id.* In this case, the jury could not come to an agreement on Instructions No. 3 and No. 4. Thus, the jury in this case was only divided and not deadlocked.

 Furthermore, the trial court did not give an instruction "regarding the desirability of reaching a verdict." In this case, the trial court told the jury that it could find Elders guilty under Instruction No. 3 or under Instruction No. 4 or not guilty under both No. 3 and No. 4. Elders has failed to show how this explanation was an instruction by the trial court as to the desirability of reaching a verdict. When a trial court makes a statement that does not discuss the desirability of a verdict, the issue is not whether the statement complies with RCr 9.57(1), but whether the statement was coercive. *Mills v. Commonwealth,* 996 S.W.2d 473, 493 (Ky.1999), *overruled on other grounds by Padgett v. Commonwealth,* 312 S.W.3d 336 (Ky.2010).

 As set forth in *Bell v. Commonwealth,* 245 S.W.3d 738, 742–43 (Ky. 2008):

When analyzing whether a trial court has coerced a jury verdict, this Court has explained that the "ultimate test of coercion is whether the instruction actually forces an agreement on a verdict or whether it merely forces deliberation which results in an agreement." We analyze the totality of the circumstances. The time lapse between the alleged coercive comment and the verdict may be relevant as part of the totality of circumstances, though not decisive. "[S]tatements which merely impress upon the jury the propriety and importance of coming to an agreement do not rise to the level of reversible error." At the same time, however, it must be remembered that "the words and acts of a presiding judge have great weight with juries, and for that reason we have often

written that he should at all times be cautious in what he says or does in the presence of the jury."

(Citations omitted).

Upon review of the record, it is clear that the trial court did not coerce the jury to reach a verdict. Specifically, the trial court did not make a statement regarding the propriety and importance of coming to an agreement. Instead, the trial court further explained the instructions that the jury had been given. "It is wholly proper for a court to explain orally its written instructions. However, the court is not at liberty to amplify or to give supplemental instructions that are inconsistent with the indictment or that pertain to collateral information." *Willis v. Commonwealth*, 304 S.W.3d 707, 711 (Ky.App.2009) (citations omitted). Thus, we cannot say the trial court's statements were coercive or that it erred in orally explaining Instructions No. 3 and No. 4.

CONCLUSION

For the foregoing reasons, we affirm the order of the Jefferson Circuit Court denying Elders's motion to suppress. We also affirm the judgment of the Jefferson Circuit Court.

ALL CONCUR.