James Anthony GRAY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

2013-SC-000374-MR

Supreme Court of Kentucky.

RENDERED: FEBRUARY 18, 2016

COUNSEL FOR APPELLANT: Erin Hoffman Yang, Assistant Public Advocate.

COUNSEL FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Jeffrey Allan Cross, Assistant Attorney General.

OPINION OF THE COURT BY CHIEF JUSTICE MINTON

A circuit court jury convicted James Anthony Gray of two counts of murder for intentionally killing his parents, James and Vivian Gray, and one count of tampering with physical evidence. He was sentenced to twenty years' imprisonment for each murder and five years' imprisonment for tampering with physical evidence, running consecutively for a total of forty-five years' imprisonment. He appeals the resulting judgment to this Court as a matter of right.[1]

Gray presents several claims of error on appeal, and we will address each of them. Most notably, he argues that the trial court erred when it failed to suppress his confession made during protracted interrogation by sheriffs detectives. He asserts the confession was involuntarily extracted through trickery that included the interrogators' use of false claims and phony documents. Because we agree that this confession was not voluntarily given, we reverse Gray's convictions and remand this case to the trial court for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

James and Vivian Gray were shot to death in their home. The Grays were generally considered affluent, having owned and operated a successful downtown business for decades. They had a tumultuous relationship with their son, James Anthony Gray. This family rift and allegedly missing wills that purportedly disinherited Gray made him an immediate person-of-interest, and ultimately the prime suspect in the official investigation.

About six months elapsed before the sheriffs investigators called Gray to the sheriffs office to answer questions ostensibly related to the missing wills. He received *Miranda* warnings and opted to speak with investigators. After a brief break in the questioning, the investigators shifted gears, deciding to question Gray about his parents' murder. Five-and-a-half hours of unrecorded interrogation followed. Investigators used a number of different ruses and forms of trickery, in-

---

1. Ky. Const. § 110(2)(b).

cluding a forged lab report of DNA evidence linking Gray to the murders and an alleged phone call from a judge threatening the certain imposition of the death penalty if Gray did not confess to them. Shortly after the interrogation ended, the cameras came back on and Gray confessed to murdering his parents. He was promptly arrested.

Gray moved before trial to suppress this confession. The trial court denied his motion because, in light of the totality of the circumstances, the trial court could not conclude that the confession was involuntarily given. The trial court was admittedly troubled by the investigators' method of obtaining the confession but determined he could not conclude the confession was coerced.

Gray's first trial resulted in mistrial when the jury failed to agree on a verdict. In the second trial, the jury convicted Gray of the murders and tampering with physical evidence and recommended a sentence of forty-five years' imprisonment. The trial court entered judgment accordingly, and Gray appeals that judgment to this Court.

Gray asserts a number of trial errors. Specifically, he raises seven issues for our review: (1) whether the trial court erroneously admitted the confession Gray gave to law enforcement; (2) whether the trial court improperly refused to allow Gray to present alternate perpetrator evidence (aaltperp); (3) whether the trial court failed to allow Gray to present a full defense; (4) whether inadmissible prior-bad-acts evidence was admitted against him; (5) whether the trial court erred in giving an *Allen* charge; (6) whether the Double Jeopardy Clause barred his second trial; and (7) whether a variety of minor errors cumulatively rendered his trial fundamentally unfair.

## II. ANALYSIS.

### A. The Trial Court Should Have Suppressed Gray's Confession.

■ The most troubling claim of error Gray presents to us on appeal is whether the trial court erroneously failed to suppress the confession Gray gave to law enforcement. The Commonwealth does not dispute that interviewers used false statements and fabricated documents as a technique to coax Gray into admitting he murdered his parents.

■ Police trickery is not new to our criminal procedure jurisprudence, but today's actions exceed any reasonable leeway our case law has previously afforded law enforcement. This issue presents mixed questions of law and fact. We review the trial court's findings of fact for clear error, but legal determinations we examine de novo.[2]

■ The Due Process Clause of the Fourteenth Amendment precludes the use of involuntary confessions against a criminal defendant at trial.[3] The United States Supreme Court defines an *involuntary confession* as one that is "not the product of a rational intellect and a free will."[4] And "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."[5] Under Kentucky law, we

---

2. *See Dye v. Commonwealth*, 411 S.W.3d 227, 230–31 (Ky.2013).

3. *See Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

4. *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (internal quotation marks omitted).

5. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

evaluate the voluntariness of a confession using a three-part test. In determining whether a confession was coerced, a court considers: (1) whether police activity was objectively coercive; (2) whether the coercion overwhelmed the will of the defendant; and (3) whether the defendant has shown that the coercive activity was the "crucial motivating factor" behind his confession.[6]

■■■■ In reaching our decision on the voluntariness of Gray's confession, we must view the facts and evidence under the "totality of [the] circumstances."[7] Aiding our inquiry, we are given many factors to consider in light of the circumstances behind an individual confession. One set of criteria is defendant-specific, such as the defendant's age, intelligence, education, criminal experience, and criminal and mental condition at the time of the interrogation. Another set of criteria requires us to consider methods employed in the interrogation itself, including whether there was any physical or mental coercion, threats, promises, delay, and the extent of trickery and deception used in questioning.

A confession obtained by police through trickery is not a new issue for us.[8] In *Springer v. Commonwealth*, we refused to suppress a confession because "the mere employment of a ruse, or 'strategic deception,' does not render a confession involuntary so long as the ploy does not rise to the level of compulsion or coercion."[9] In essence, we have refused to hold that intentional police misinformation by itself makes a confession involuntary. But both parties rightly remind us that the particular issue presented today—falsified documents purporting to represent the official results of a state-police lab's DNA examination—is one we have yet to confront. To understand this issue under the totality of the circumstances, it is important to frame precisely what activities law enforcement used in Gray's interrogation.

Gray was summoned to the sheriff's office ostensibly to address a matter related to his parents' will. After a break, he returned to the interview room and signed a *Miranda* waiver. Upon his return, the room was arrayed with photos of the crime scene and murder victims. A piece of pecan pie and a Pepsi were placed on the table to recreate the crime-scene environment. The police turned off the camera and five-and-a-half hours of unrecorded interrogation proceeded from that point. Gray alleges he was coerced into confessing to the crimes within this period.

According to Gray, interrogators showed him pictures of his parents' corpses, told him that their blood was found on his clothes and in his vehicle, told him that gunshot residue was found on his clothing, and told him that an eyewitness and a videotape recording placed him at the scene of the crime. Law enforcement admitted that they made these representations to Gray and that all of them were false. Interrogators presented Gray a fake document purporting to originate from the Kentucky State Police linking his parents' DNA to his vehicle. Finally, Gray alleges that while he was being inter-

---

6. *Benjamin v. Commonwealth*, 266 S.W.3d 775, 786 (Ky.2008).

7. *Haynes v. State of Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). *See also Dye*, 411 S.W.3d at 232.

8. *See Matthews v. Commonwealth*, 168 S.W.3d 14, 21 (Ky.2005) (holding that ruses and evidence ploys are an acceptable law enforcement practice). *See also Springer v. Commonwealth*, 998 S.W.2d 439 (Ky.1999).

9. *Springer*, 998 S.W.2d at 447 (referring to *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990)).

rogated, an officer claimed to have received a phone call from the judge, who threatened use of the death penalty against Gray if he did not confess. Gray confessed but the text of his admission is filled with statements that suggest he did not truly believe he committed the crime.

Admittedly troubled by the investigative techniques, the trial court denied Gray's suppression motion nonetheless. The trial court made a factual finding that the phone call from the judge did not take place, and he removed this factor from his analysis. He then reviewed the remaining evidence of false information in light of the voluntariness test and Kentucky's Anti–Sweating Statute.[10] Considering the totality of the circumstances—including the recorded confession Gray made in the sheriff's office that day combined with the specific exculpatory language used in the confession—the trial court was led to conclude that Gray's will was not overwhelmed by the ruse the sheriffs investigators employed to induce his confession.

Considering all of the events leading up to Gray's confession, we must disagree with the trial court's ruling. Although no single factor prompts our decision, the hours of manipulation and fabricated evidence can be nothing other than coercion that overbore Gray's free will.

We make clear at the outset that we will not consider the alleged threatening phone call from a judge as part of our totality-of-the-circumstances analysis. On appeal, Gray presents this as a factual issue for our review. But the trial court found as a matter of fact that this threat did not occur. And we will only reverse the trial court's factual finding upon discovery of independent evidence outside of Gray's version of the narrative that corroborates his story. So, locating no such evidence in the record, we must defer to the trial court in stating that as a matter of fact, the alleged phone-call threat from the judge did not occur, and it will bear no weight in the remainder of our review in determining whether his confession was voluntarily made.

### 1. Police Tactics Used were Problematic but not Objectively Coercive.

Beginning our analysis of whether Gray voluntarily confessed, we first ask whether the police activity was objectively coercive. The false statements and fabricated documents are critical to our inquiry. Statements deceptively overstating the evidence against a criminal defendant during interrogation fall within the trickery we have traditionally tolerated.[11] But we have never faced a situation where deceptive interrogation tactics included fake reports made to link DNA evidence to the defendant.

Briefing reveals an underlying debate in state courts that have confronted this issue. The debate centralizes on two competing approaches: the bright-line approach as seen in the Florida rule from *State v. Cayward*[12] and the more balanced rule as seen in the Maryland rule in *Lin-*

---

10. KRS 422.110 ("no peace officer or other person having lawful custody of any person charged with crime, shall attempt to obtain information from the accused concerning his connection with or knowledge of crime by plying him with questions, or extort information to be used against him on his trial by threats or other wrongful means, nor shall the person having custody of the accused permit any other person to do so.").

11. *Matthews,* 168 S.W.3d 14 (Ky.2005).

12. 552 So.2d 971 (Fla.Dist.Ct.App.1989), *dismissing review,* 562 So.2d 347 (Fla.1990) (drawing a bright line declaring confessions resulting from use of fabricated lab evidence per se involuntary).

coln v. State.[13] In establishing this Court's position on the place in our constitutional jurisprudence and criminal justice system for this form of trickery, we must thoroughly examine the principles conveyed in those two conflicting approaches.

The trickery in *Cayward* was factually very similar to the case at hand. There, the defendant was accused of sexually assaulting his five-year-old niece.[14] He voluntarily came to the police station for an interview, was given his *Miranda* warnings and signed a waiver of those rights.[15] He was then interrogated for two hours, during which police produced manufactured reports of evidence against him.[16] Ultimately, Cayward confessed to the crime.

The Florida District Court of Appeals responded under the state's notions of due process of law by establishing a bright-line rule prohibiting use of falsified documents.[17] The court went so far as to declare a difference between deceptive oral statements and physical documentation of false evidence. A major factor is the presumed legitimacy and persuasive weight that documented evidence originating from police and state investigative agencies carries in court. Additionally, practical concerns like the risk of counterfeit reports making their way into court or accidentally being offered as substantive evidence further supported the appellate court's conclusion that this type of evidence had no place in Florida's criminal justice system.[18] So if we were to adopt the *Cayward* rule, our analysis need not continue because we would declare police activity in this case objectively coercive, making a voluntary confession under these circumstances impossible.

Alternatively, in *Lincoln*, the Maryland appellate court expressly rejected the *Cayward* bright-line approach.[19] Like the present case, *Lincoln* involved a murder investigation.[20] Instead of endorsing the Florida approach, *Lincoln* declared that a reviewing court should consider the use of false documents as merely one factor in the totality of the circumstances test—a similar approach to the traditional method of confronting police trickery in general.[21]

We cannot say that use of falsified documents is an objectively coercive police tactic, although it comes dangerously close. So we will not adopt the *Cayward* bright-line approach. But, at the same time, we do not view fabricated scientific evidence in the same vein as any other factor in the totality-of-the-circumstances analysis. We agree with *Cayward* that this tactic disturbs traditional notions of due process of law and may lead potentially to more harmful results. And we also do not want to encourage this type of behavior from law enforcement in the future. So while we cannot declare all uses of fabricated

13. 164 Md.App. 170, 882 A.2d 944 (Md.Ct. Spec.App.2005), *cert. denied*, 390 Md. 285, 888 A.2d 342 (2005) (strongly distinguishing *Cayward*'s bright-line rule).

14. *Cayward*, 552 So.2d at 972.

15. *Id.*

16. *Id.*

17. *Id.* at 974.

18. *Id.* at 974–75.

19. Maryland is not alone in rejecting the categorical rule formed in *Cayward*. Other states rejecting this method include Virginia (*Arthur v. Commonwealth*, 24 Va.App. 102, 480 S.E.2d 749 (1997)), and Nevada (*Sheriff, Washoe County v. Bessey*, 112 Nev. 322, 914 P.2d 618 (1996)).

20. *Lincoln*, 164 Md.App. at 175, 882 A.2d 944.

21. *Id.* at 191–92, 882 A.2d 944.

documents inherently coercive, we are highly suspicious of this practice, especially when the document misrepresents scientific or DNA evidence against a criminal defendant.

■ Although we must decline to adopt for Kentucky a bright-line rule that the use of falsified documents is objectively coercive in all situations, we think the risk of constitutional infirmity is so severe that a petitioning defendant is entitled to a presumption in his favor. As is the case with other constitutional liberties, here we must place the burden on the Commonwealth to prove it did not abuse its power. When a criminal defendant, like Gray, can establish that the police use falsified documents to induce a confession, we will presume this tactic is unconstitutional until the Commonwealth can firmly establish that the document(s) did not overwhelm the defendant's will and was not a critical factor in the defendant's decision to confess. We will now evaluate Gray's interrogation under that standard.

### 2. The False Evidence Overwhelmed Gray's Will.

■ The next step in evaluating the voluntariness of Gray's confession is a review of whether the false evidence overwhelmed his free will. The controlling factors in this analysis are the volume of false evidence used and the heft that inheres in DNA evidence. We view this aspect of our analysis as an objective one in which we ask whether the tactics em-

ployed by police would overwhelm the will of an ordinary defendant. Because of how actively the interrogators used this evidence to deceive Gray during the several hours' interrogation and the power of documented DNA evidence in the mind of an average person, we conclude that this overwhelmed Gray's will.

DNA evidence carries enormous probative weight in criminal adjudications.[22] Because of its powerful probative effect, we have gone to great lengths to ensure that this information is accurately and fairly introduced at trial.[23] In his brief, Gray points to the Rational Choice Model, an academic theory postulating that many criminal defendants choose to confess when faced with an abundance of evidence against them as the more economical solution.[24] Given the evidentiary power DNA and forensic evidence enjoys in the minds of jurors, it is reasonable to conclude that documents containing incriminating scientific evidence would similarly cause the ordinary criminal defendant to consider maintaining his innocence a futile endeavor.

In addition to invoking highly probative scientific evidence, the abundance of false evidence and the frequency with which it was invoked weigh heavily in overwhelming Gray's free will. Not only did the interrogators use a fabricated document purporting to confirm the existence of DNA evidence incriminating Gray, they also claimed to have video footage placing him at the crime scene, blood spatters on

---

22. *See Brown v. Commonwealth,* 313 S.W.3d 577, 617 (Ky.2010) ("... DNA evidence is powerful evidence and for that reason material misrepresentations of its significance are apt to be prejudicial."). Although *Brown* involved the methods of proving this type of evidence at trial (and not the existence of the material at all), it nonetheless confirms the powerful role this type of evidence has in the minds of jurors.

23. *See id. See also Duncan v. Commonwealth,* 322 S.W.3d 81, 93 (Ky.2010).

24. Miriam S. Gohara, *A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques,* 33 Fordham Urb. L.J. 791, 817–19 (2006).

his clothing, and more DNA evidence beyond what was shown in the fake report. This was repeated multiple times over the course of a seven-and-a-half hour interrogation, most of which was not recorded. When faced with seemingly insurmountable evidence, it becomes reasonable for one to perceive the futility of maintaining innocence. Indeed, facing overwhelming documentary and verbal forensic evidence, we think an average defendant in Gray's situation would feel pressured to confess to the point that it usurps free will.

### 3. These Tactics were the Crucial Motivating Factor Behind Gray's Confession.

In contrast to the previous factor, this analysis is a subjective inquiry into whether the police interrogation tactics were the crucial reasons why Gray confessed at the sheriffs office. Essentially, we seek to determine whether Gray confessed because of the interrogation pressures he faced in the five-and-a-half hours of unrecorded interrogation at the sheriffs office that day. We think the answer is revealed in the transcript of Gray's recorded confession:

Gray: I don't know who was there, or with me, whatever. I don't have a clue. I don't know who if I told anybody. I don't remember. I don't—after that is—it's all gone. I mean, I just kind of—it was—*and until, you know, you guys made me realize what I had done, I didn't even know or believe I had done it.*

Persley: But you are telling us today what you did. You are admitting it.

Gray: *Yes, with your evidence, it helped me to.*

Persley: Go ahead; I'm sorry.

Gray: *With the evidence that you showed me, it helped me to see what I done, I still don't believe I done it but you know, with the evidence I must have.*

Reviewing the text of his statement, it seems clear that the false evidence weighed heavily in Gray's decision to admit to the murders. Combined with the volume of evidence that overwhelmed his free will as discussed above, we think this is enough to conclude that the interrogators' deceptions were the crucial motivating factor leading to his confession.

The Commonwealth downplays the impact this evidence played on Gray's decision to confess because of the amateurish quality of the counterfeit lab report. Specific details about the nature of the document like the term *DNA* not being capitalized and the off-centered text are the Commonwealth's main grounds supporting the implausibility of Gray's assertion that he believed the fake document to be authentic and that this belief moved him to confess. To us, the Commonwealth's position is a shortsighted take on the abundance of misrepresentations made to Gray that day.

Gray is a mechanic with limited education; it assumes too much to think he would be able to distinguish at a glance a counterfeit KSP lab report from an authentic one. Our operative assumption should not be an expectation that citizens should distrust everything law enforcement tells them or shows them. The contrary should be true. Ordinarily, when a police officer presents a lab report purporting to represent DNA evidence of criminality, one likely does not carefully examine the contents for detailed accuracy. To us, it seems in this case that the overwhelming weight of false evidence brought forth against Gray directly prompted his confession that day at the sheriffs office. After review of all three factors guiding our determination on the voluntariness behind Gray's confession and

in consideration of the totality of the circumstances, we conclude that the confession at the sheriffs office was not the voluntary product of Gray's free will.

Gray's constitutional right to due process of law was violated in obtaining the confession. The trial court erred by failing to suppress the confession, and it was thus erroneously admitted as evidence at trial.

### 4. The Error Admitting Gray's Confession was not Harmless Beyond a Reasonable Doubt.

We must now assess the propriety of Gray's convictions because of this error at trial. For constitutional errors that contribute to a criminal conviction, those errors are presumed prejudicial unless a reviewing court can conclude they were "harmless beyond a reasonable doubt."[25] Under this standard, if the evidence against a defendant is so overwhelming that he would be convicted in spite of the constitutional violation, the violation is harmless.[26] Essentially, if we are certain the outcome would remain unchanged even if this piece of evidence was excluded, we may preserve Gray's conviction. There are a number of competing considerations in reaching this decision; but, ultimately, we cannot hold that erroneously admitting this confession at trial was harmless beyond a reasonable doubt.

The Commonwealth is correct in asserting that there is considerable evidence pointing to Gray's guilt. Most notably, the fact that Gray made an independent confession to Eric Frazier while in jail for an unrelated charge weighs heavily in the Commonwealth's favor. During that brief stint in jail, Gray gave Frazier a detailed account of the shootings, bragged about his impending financial windfall, and boasted that the police would never prove he did it. Not only does this independent confession tend to prove Gray's guilt, but it also mirrors exactly the evidence contained in the erroneously admitted confession given at the sheriff's office.

Also, the constitutional issues involved in obtaining the police confession were disclosed to the jurors. The trial court recognized the problematic nature of the tactics the police used to provoke Gray's confession. So despite denying Gray's motion to suppress, the trial court allowed Gray to present evidence of the manner in which the confession was obtained and permitted Gray to ask jurors to disbelieve the confession.[27] Gray was free to inform jurors on the constitutional problems involved in obtaining his confession, and he was free to tell them simply to ignore its existence.

Ultimately, despite the fact that the Commonwealth was able to use similar evidence and Gray was able to attack the methods used in eliciting his confession, we cannot say that admitting the sheriff's-office confession was harmless beyond a reasonable doubt. Gray's case had already mistried once with a deadlocked jury; and, in the second trial, the jury deliberated for a long time before returning a guilty verdict. And introduction of involuntary confessions at trial has almost always resulted in a new trial.[28] Be-

**25.** See *Chapman v. California,* 386 U.S. 18, 23–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See also *Whittle v. Commonwealth,* 352 S.W.3d 898, 905–06 (Ky.2011).

**26.** *Id.*

**27.** The trial court in this instance appears to have invoked correctly a defendant's rights to attack the credibility of a confession under *Crane v. Kentucky,* 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986).

**28.** *Chapman v. California,* 386 U.S. 18, 42–43, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (Stewart,

cause of the credibility officers of the law enjoy in our community and the persuasive force that associated with a confession made to the police, we simply cannot uphold Gray's verdict in light of the circumstances in this case.

The police here admit to all of the allegations Gray asserts except the alleged phone-call threat from the judge. Essentially, law enforcement does not attempt to refute Gray's account of the interrogation, but instead, urges us to endorse their deceptive tactics for obtaining his confession. But we find the tactics employed by law enforcement in this case constitutionally unjustifiable, and our steadfast fidelity to the federal and state Constitutions directs us to condemn them. Harmless misdirection and simple ruses may be constitutionally permissible in some situations, but use of false statements and phony lab reports as the sole basis for hours of unrecorded interrogation offends the guarantee of due process of law. Because we conclude that the weight of false evidence against Gray and the pressures exerted by interrogating officers overwhelmed his conscience, the trial court's decision to deny suppression was error. The confession should have been excluded from trial. We reverse the judgment and remand the case to the trial court for further proceedings consistent with this opinion. We review the remaining allegations of error for mistakes capable of repetition in the event of a retrial.

## B. The Trial Court Improperly Excluded Gray's Aaltperp Evidence.

▆ Gray's next claim of error is that the trial court erroneously refused to admit his alternate perpetrator (aaltperp) evidence at trial. Gray maintained his own theory of who murdered his parents. He suggests the true perpetrator was Peter Hafer. In the time leading up to the Grays' murders, Hafer had recently stolen a large number of guns from a local gun dealer. After the theft, Hafer had sold some of the stolen guns to James Gray, the father. Jodi Lucas, a family friend and the first person to discover the Grays' dead bodies, informed police she had found a large number of guns the elder Gray had left in her basement. Gray's aaltperp theory focused on Hafer's knowledge of the Gray family's wealth and statements Hafer had made that he intended to rob and kill the Grays. Further, Hafer drove a van, and witnesses reported seeing a van near the Grays' property around the time of their murders.

At Gray's first trial, Hafer appeared as a witness, but his testimony was never offered because he immediately invoked his Fifth Amendment right against self-incrimination on the advice of counsel. Gray attempted to offer several potentially inculpatory statements Hafer had made to federal agents, but they were excluded. And the trial court excluded other statements from several other witnesses relating to Hafer's involvement with the Grays. Gray argued at trial that this testimony was essential to his aaltperp theory.

▆ The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the opportunity to present a full defense, and that guarantee includes the right to introduce evidence that an alternate perpetrator committed the offense.[29] We show great deference to

J., concurring) (referring to *Lynumn v. State of Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963)). *See also Haynes v. State of Washington*, 373 U.S. 503, 518–19, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (even when the

Confession is completely "unnecessary" to the conviction, the defendant is entitled to "a new trial free of constitutional infirmity").

**29.** *See Harris v. Commonwealth*, 134 S.W.3d 603, 608 (Ky.2004).

a trial court's evidentiary rulings and reverse only upon a finding of an abuse of discretion. So the trial court's ruling on this issue will be affirmed absent a showing that the trial court's ruling was "arbitrary, unreasonable, unfair, or unsupported by legal principles."[30] Applying this standard, the trial court abused its discretion in refusing to admit evidence in support of Gray's aaltperp theory because Gray adequately asserted the minimum probativeness required to introduce an aaltperp theory.

In *Beaty v. Commonwealth*, we held that one way to advance an aaltperp theory of defense is to establish that an alternate perpetrator had both the motive *and* opportunity to commit the crime before introducing evidence at trial in support of that theory.[31] But somewhere between *Beaty* and today, this method seems to have calcified into a categorical rule for introducing aaltperp evidence. It is true we require qualification as a matter of necessity to prevent unsupported or widely speculative theories that may mislead or confuse the jury.[32] But the motive-and-opportunity approach articulated in *Beaty* is not the only path to advance an aaltperp theory and it is certainly not an absolute prerequisite for admission into evidence.

It is undisputed that evidence tends to show that Hafer had motive to commit the crime and that this motive was established at trial. No doubt, a stated intention to rob the Grays and kill them in their home is sufficient evidence of motive to satisfy the first prong of the *Beaty* aaltperp test. But the trial court was not satisfied with Gray's proffer of evidence to support a finding of Hafer's opportunity to commit the murders. Hafer's alleged opportunity was considered too speculative to be presented to the jury. But we hold that this conclusion was misplaced.

At its heart, the critical question for aaltperp evidence is one of relevance: whether the defendant's proffered evidence has any tendency to make the existence of any consequential fact more or less probable.[33] And the best tool for assessing the admissibility of aaltperp evidence is the Kentucky Rules of Evidence. Naturally, under the powerfully inclusionary thrust of relevance under these rules, it would appear almost any aaltperp theory would be admissible at trial. But KRE 403 provides the qualification of this evidence we considered necessary in *Beaty*. That rule prompts the trial court to weigh the probative value of the evidence against the risk of prejudice at trial, including confusing the issues or misleading the jury.[34] Essentially, the balancing test found in KRE 403 is the true threshold for admitting aaltperp evidence; *Beaty* and its progeny are simply this Court's way of guiding the trial court in assessing the probative value of prospective aaltperp theories.

Motive and opportunity are not required to admit an aaltperp theory at trial, but it is but one of many ways a defendant may successfully assert this defense. To be sure, we reaffirm *Beaty*'s assertion that a defendant's proof of motive and opportunity is certainly probative enough for admission under KRE 403.

---

30. *See Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

31. 125 S.W.3d 196 (Ky.2003).

32. *Id.* at 207 ("... [a] trial court may only infringe upon this right [to a complete defense] when the defense theory is 'unsupport-

ed,' 'speculat[ive],' and 'far-fetched' and could thereby confuse or mislead the jury.").

33. KRE 401.

34. KRE 403.

But we do not require a defendant to recount a precise theory of how the aaltperp did the deed. Rather, all KRE 403 requires is evidence of some logical, qualifying information to enhance the proffered evidence beyond speculative, farfetched theories that may potentially confuse the issues or mislead the jury. And we think Gray has more than enough probative information under this standard to warrant admission of his aaltperp evidence.

▮ Essentially, the decision to admit an aaltperp theory at trial is committed to the sound discretion of the trial judge. But we caution trial courts that aaltperp-evidence theories must be supported by more than speculation or exculpatory name-dropping when assessing the probativeness of evidence under KRE 403. The proponent of the theory must establish something more than simple relevance or the threat of confusion or deception can indeed substantially outweigh the evidentiary value of the theory. Motive and opportunity is one way to achieve that goal, but as we stated above, it is not the only acceptable method. There must simply be some legal or factual basis to the theory beyond raising an inference to mitigate the risk of harm that can be quite substantial.

In the case at hand, it is unclear from the evidence precisely when the Grays were murdered. The Commonwealth urges us to conclude they were killed on the afternoon or evening of Tuesday, April 24, 2007 (when Gray had no alibi). But Gray suggests they died the following day, pointing to several witnesses who may have seen them Wednesday morning. Either way, there is a span of time when the crime could have occurred. We do not know Hafer's account of his movements during that two-day span because he invoked his right against self-incrimination. Without any information from Hafer, we cannot know whether he had an alibi during that 36–48 hour period. Nevertheless, we are faced with nearly two days of time when the crime could have been committed and an aaltperp with a motive to have played a role in the Grays' deaths. Gray's right to present a complete defense at trial was impaired by the trial court's exclusion of his aaltperp evidence.

## C. Gray was not Denied the Right to Present a Complete Defense by Being Limited in his Critique of the Police Investigation.

Gray believes he was denied due process of law because the trial court refused to allow him to question law enforcement on particular aspects of the investigation of this crime. This issue relates to three aspects of Gray's case. First, he was not permitted to call as a witness Mike Mathis, a retired police officer, to point out glaring flaws in the investigative process, critiquing the sheriff's department's overall performance in this case. Second, the trial court limited Gray' cross-examination of Detective Persley, one of the interrogating officers at the sheriff's office. Finally, the trial court limited Gray's examination of law enforcement by not allowing him to ask the officer about the legality of their interrogative techniques. Because these are evidentiary rulings, we review each of the trial court's decisions for an abuse of discretion.

### 1. Mike Mathis as a Defense Expert.

▮ Mathis was set to testify as a defense expert to a variety of missteps occurring during the course of the official investigation of the Grays' murders. Particularly, he would supposedly testify to the correlation between the law enforcement's lack of control of the crime scene and Gray's knowledge of how the crime occurred. Mathis is a retired police offi-

cer now employed as a private investigator in Tennessee. He has no published works or peer-reviewed articles or any other professional credentials beyond his years of law enforcement experience and his subjective view of the investigation. The trial court, concerned about future uses of this type of testimony, refused to allow Mathis to testify as an expert witness, so Mathis was left to testify to his observations of the crime scene. The trial court did not abuse its discretion in making this ruling.

The Kentucky Rules of Evidence (KRE) permit opinion evidence from experts providing "scientific, technical, or other specialized knowledge" if it will "assist the trier of fact" in understanding the evidence or determining a fact in issue.[35] A qualified expert may provide an opinion so long as: (1) the testimony is based on scientific facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.[36] With these rules firmly in mind, we hold that the trial court did not abuse its discretion in refusing to allow Mathis to testify as an expert.

As an initial matter, Mathis likely had the requisite qualifications to be considered an expert. Thirty years of experience conducting criminal investigations likely adequately qualifies Mathis under Kentucky's relatively liberal standard.[37] But Gray offered no objective methods or principles for the basis of Mathis's opinions other than his own subjective experiences with crime scenes across the span of his career as a police officer. Mathis would provide no specialized knowledge necessary to aid the jury in fact-finding. So the trial court properly excluded him from testifying as an expert.

## 2. Cross–Examination of Detective Persley.

The trial court limited Gray in his cross-examination of Detective Persley. This aspect of Gray's argument on this issue is closely related to the denial of aaltperp evidence we addressed above. Citing hearsay grounds, the trial court limited the cross-examination of out-of-court statements Detective Persley had heard about Hafer. Essentially, Gray intended to use statements about Hafer to assert that the sheriff's department did not conduct an adequate investigation into other leads.

We recognize that investigative hearsay is typically inadmissible.[38] So we will not rule that the trial court abused its discretion in excluding this line of questioning. With this in mind, we also recognize that we have already held that Gray should have been allowed to introduce his aaltperp evidence at trial. If this questioning comes up on retrial, the trial court must review the testimony under this standard and may not base any of its decision on the aaltperp test for admissibility.

## 3. Limited Questioning Regarding the Legality of False DNA Reports.

The trial court refused to allow Gray to question two sheriffs detectives about the legality of using a false DNA report when interrogating a suspect.

---

35. KRE 702.

36. *Id.*

37. *See* LAWSON, THE KENTUCKY EVIDENCE LAW HANDBOOK, § 6.15(3)(c) (LexisNexis Matthew Bender) ("... the trial court's inquiry under KRE 702 is whether the qualifications of a witness to testify as an expert are 'adequate' (and not whether they are 'excellent' or 'outstanding').").

38. *See Chestnut v. Commonwealth,* 250 S.W.3d 288, 294 (Ky.2008).

Gray wanted to use this opportunity to highlight "their willingness to commit forgery and possibly run afoul of the law." The trial court prohibited this line of questioning and threatened sanctions if Gray's counsel did not comply. We agree that this line of questioning was inappropriate and, accordingly, conclude that the trial court did not abuse its discretion in refusing to allow it.

## D. No Improper Character Evidence was Admitted at Trial.

Gray next alleges that the trial court improperly admitted evidence against him at trial contrary to the principles set forth in the Kentucky Rules of Evidence. He contends that the trial court erroneously allowed evidence of prior bad acts against him at trial. Among this testimony are alleged threats to kill his girlfriend, Rosa Rowland, and other statements Gray allegedly made expressing his desire to kill his parents. Again, as an evidentiary ruling, we review the trial court's decision for an abuse of discretion. Finding no error in admitting the statements, the trial court did not abuse its discretion.

Under our rules of evidence, proof of a person's character or particular character trait is generally inadmissible to show conformity with that character on a particular occasion.[39] KRE 404(b) states that evidence of other crimes, wrongs, or acts are prohibited to prove conformity to character, with exceptions in criminal cases for proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. It is also true that it is only proper to admit relevant evidence.[40] Evidence becomes relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[41] Finally, even upon a finding that evidence is relevant, we may still nonetheless exclude testimony if its probative value is "substantially outweighed" by risk of unfair prejudice to the defendant.[42]

### 1. Gray's Statements About Rosa Rowland.

██ Rowland was Gray's girlfriend at the time of the Grays' murder. She is a drug addict and highly unpredictable. The two had a very unstable relationship, frequently fighting over Rowland's drug use. Gray made two statements expressing his desire to kill her. The first occurred when Gray was briefly jailed in mid–2007.[43] At that time, he told his fellow inmate, Eric Frazier, that he was thinking of killing Rowland. The second statement was made to Betty White at an old truck stop. According to White, Gray commented that he "should have killed her a long time ago" and "I think I'll kill the bitch."

On first glance, this testimony seems irrelevant to the issue of whether Gray murdered his parents. Proof of threats against Rowland does not make it any more or less probable that Gray killed anyone. And it proves nothing with regard to his motivation to murder his parents or to show any type of plan or preparation to commit those crimes.

The Commonwealth correctly points out that use of prior bad acts to prove consciousness of guilt, which includes threats

---

**39.** KRE 404(a)(1).

**40.** KRE 402 ("Evidence which is not relevant is not admissible.").

**41.** KRE 401.

**42.** KRE 403.

**43.** Ironically, for violating an EPO Rowland had taken out against him.

to kill witnesses, is an acceptable practice.[44] The theory follows that Gray, concerned by Rowland's erratic behavior and fearing she may testify against him, made the threats to prevent Rowland from disclosing any incriminatory information.[45] We agree that if viewed as a threat against a witness, the statements become relevant. But, to us, that status is unclear. Gray articulately contends that at the time the statements were made, Gray was not charged with the Gray murders—they occurred months before he confessed at the sheriff's office. On the other hand, the statements were made after the Gray murders occurred. To us, this is enough to make Rowland a witness; and, therefore, the trial court did not abuse its discretion by allowing this testimony at trial.

### 2. Gray's Statements About his Parents.

At trial, the Commonwealth also made use of various statements Gray had made expressing a desire for his parents to die. Tammy Kidd testified that in 2001, Gray said he wanted to kill his parents by driving to his parents' home and shooting them; although, she admitted she did not take this talk seriously. In addition to Kidd's testimony, Cynthia Neal testified that Gray had moved to a home near her because his parents were sick and they would be dying soon. After suggesting to Gray that they seemed to be in good health, he responded by saying "I might have to help them a little." Both of these statements were used against Gray at trial.

 Gray contests the trial court's admission of Kidd's testimony under KRE 403, suggesting that because of the time elapsed between when the statement was made and when the crime occurred, the risk of unfair prejudice substantially outweighs the probative value of the evidence. He is correct in stating that temporal remoteness generally is a consideration made by the trial court in weighing the admissibility of particular evidence.[46] And we afford trial courts great deference in making those decisions. A prior statement expressing intent to commit the crime is certainly relevant to Gray's murder trial and highly probative. We simply will not displace the trial court's judgment with our own in making this determination under KRE 403. There is no indication that the trial court's decision here was arbitrary, unreasonable, unfair, or unsupported by legal principles, giving rise to an abuse of discretion.

 As for Cynthia Neal's testimony, we are less concerned about temporal remoteness. Gray allegedly made those statements to Neal two years before the murders, and we are unwilling to hold that two years is so remote as to disconnect this statement to a motive or intent to commit murder. Given the highly probative nature of this evidence, we agree with the trial court's decision to include this testimony at trial.

### E. There was no Improper *Alien* Charge.

 Before jury selection began at trial, the trial court made general introductory statements to the assembled venire about the nature of the trial process that was set to begin. These statements in-

---

**44.** *Foley v. Commonwealth,* 942 S.W.2d 876, 887 (Ky.1996) (threats against a witness in attempt to suppress testimony is evidence tending to show guilt).

**45.** In fact, through other testimony at trial, it seems that Gray did indeed fear what Rowland might tell the police.

**46.** *English,* 993 S.W.2d at 943.

clude information of the emotional and financial burden in retrying a case, that the attorneys would present the best and most persuasive evidence possible, and the importance in the end for the jury to reach a verdict. Gray posits that these statements tainted the venire.

This issue was unpreserved by an objection at trial, so we will review these statements for palpable error. Under Kentucky Rules of Criminal Procedure (RCr) 10.26, palpable error is one that affects the substantial rights of the party and a "manifest injustice" would result from the error.[47] With that lofty standard in place, we do not find palpable error in the trial court's statements.

In *Allen v. United States*, the United States Supreme Court held that there is no error in a jury instruction intending to prevent a hung jury.[48] But the practice of delivering jury instructions designed solely to pressure the jury into reaching a verdict is prohibited by the Kentucky Rules of Criminal Procedure.[49]

▉ We are unwilling to find error in the trial court's preliminary statements.[50] The lapse in time between the trial court's allegedly coercive comment and the jury's deliberation may be a relevant consideration in a totality-of-the-circumstances review.[51] We must ultimately determine whether the trial court's statement actually forces an agreement, or whether it merely fosters thorough jury deliberation that results in an agreement.[52]

We cannot conclude the trial court committed a palpable error by emphasizing to the prospective jurors the importance of their duty. The trial court made the statements in controversy before the parties began voir dire, before eleven days of trial, and before hours of juror deliberation. Gray's first trial had ended in mistrial because the jury was unable to reach a verdict. Here, the trial court simply wanted to impress upon the prospective jurors the importance of the duty they were about to undertake and the stakes involved in their deliberations. Given the enormous gap in time between the statement and the verdict, along with the broad and inconsequential nature of his statements, we do not find these instructions to be problematic, much less palpable error.

## F. Gray's Second Trial was not Barred by Double Jeopardy.

▉ For his final claim of error below, Gray argues that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution bars his second trial. Gray specifically argues that in the first trial, the trial court too readily declared a mistrial two hours after giving the jury an appropriate *Allen* charge. He also contends he was not given an opportunity to object to the court's declaration of a mistrial. As a final subpart of his claim, Gray suggests the trial court erred in addressing only the jury foreperson rather than polling each juror individually before making the decision to declare a mistrial.

---

47. *See also Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky.2009) (A manifest injustice occurs when the "error so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky.2006)).

48. 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

49. RCr 9.57. *See also Commonwealth v. Mitchell*, 943 S.W.2d 625 (Ky.1997).

50. *Mitchell*, 943 S.W.2d at 628.

51. *See Elders v. Commonwealth*, 395 S.W.3d 495 (Ky.App.2012).

52. *Elders*, 395 S.W.3d at 504. *See also Bell v. Commonwealth*, 245 S.W.3d 738 (Ky.2008).

This inquiry was also made by the trial court on its own initiative while the jury was on a smoke break.

 The decision to declare a mistrial is properly within the sound discretion of the trial court.[53] A mistrial is "an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity."[54] A "manifest necessity" can be understood as to be an urgent need for a new trial in consideration of the totality of the circumstances. As such, a ruling declaring a mistrial will not be disturbed absent an abuse of discretion by the trial court.[55]

In *Cardine*, we held that once jeopardy attaches, a second jury trial is prohibited absent the "manifest necessity" prerequisite to the declaration of a mistrial.[56] The Commonwealth correctly notes that a hung jury is a classic example of this standard. The facts are clear that the jury in Gray's first trial had been deadlocked for over ten hours (two of which occurred after the trial court delivered a proper *Allen* charge). At that point, the trial court apparently determined that the jury would be unable to reach a verdict, and it was necessary to declare a mistrial. We afford considerable deference to trial courts in deciding to grant mistrials, and we see no evidence here jarring enough to displace the trial court's determination. We simply cannot say that the trial court abused its discretion in concluding the jury in Gray's first trial was indefinitely deadlocked. So we hold that Gray's second trial was proper; and, as such, there can be no violation of the Double Jeopardy Clause.

### G. Cumulative Error.

Having already reversed Gray's convictions on other grounds, and weighing in on matters that may re-appear once this case is tried again, there is no need to conduct a cumulative-error review.

## III. CONCLUSION.

Because we find the interrogation techniques employed by the sheriffs detectives to induce Gray's confession to the murder of his parents to be an unconstitutional violation of due process, we reverse his convictions and remand the case to the trial court for proceedings consistent with this opinion.

All sitting. All concur.

**53.** *Cardine v. Commonwealth,* 283 S.W.3d 641, 647 (Ky.2009).

**54.** *Id.* (quoting *Bray v. Commonwealth,* 177 S.W.3d 741, 752 (Ky.2005)).

