RENDERED: JUNE 16, 2016
TO BE PUBLISHED

$$\mathfrak{Supreme\ Court\ of\ Kentucky}$$

2015-SC-000218-MR

FINAL
DATE 7-7-16 C. Coleman DC

SHANNON GEARY                                      APPELLANT

V.                  ON APPEAL FROM MUHLENBERG CIRCUIT COURT
                   HONORABLE BRIAN WIGGINS, JUDGE
                        NO. 14-CR-00167

COMMONWEALTH OF KENTUCKY                       APPELLEE

## OPINION OF THE COURT BY JUSTICE WRIGHT

## AFFIRMING

A Muhlenberg County Grand Jury indicted Shannon Geary for first-degree robbery, being a felon in possession of a handgun, and being a persistent felony offender. A Muhlenberg Circuit Court jury convicted Geary of first-degree robbery, and, after finding him to be a persistent felony offender, recommended a sentence of thirty years' imprisonment. The trial court sentenced him accordingly. Geary now appeals to this Court as a matter of right pursuant to § 110(2)(b) of the Constitution of this Commonwealth. Geary raises the following issues on appeal: 1) whether the trial court erred by denying his request for the Kentucky State Police laboratory to test two bandanas for his DNA; 2) whether the trial court erred by excluding his proffered alternate perpetrator testimony, and if so, whether that exclusion deprived him of his right to present a defense; 3) whether the trial court erred

by denying him the opportunity to impeach a witness for an alleged inconsistent statement; and 4) whether the testimony of a parole officer regarding good-time credit rose to the level of palpable error.

## I. BACKGROUND

On August 27, 2014, a neighbor spotted William Faith on the side of the road, bound by extension cords, yelling for help. Earlier in the day, a woman approached Faith's house claiming she was there to deliver a letter from his paramour. Under these false pretenses, she and the two men who accompanied her gained entry to Faith's home. One of the men concealed his identity with a black bandana, long sleeves, and something over his head. The trio took turns holding Faith at gunpoint, bound him with extension cords, and ransacked his home. They stole guns, televisions, jewelry, knives and other valuable items. The three robbers ultimately fled the scene in a van.

Faith identified Jesse Hailey and Kristi Copeland as being the two un-masked robbers. Hailey and Copeland ultimately pled guilty to first-degree robbery. Copeland told police Geary was the third robber. Copeland indicated it was Geary's idea to rob Faith, only Geary knew where Faith lived, and Geary borrowed a van from his cousin, Lola Caudill, to use in the robbery. Faith testified he was unable to identify the masked robber, but stated the masked robber held him at gunpoint and said that this was what Faith got for messing with a married woman. Geary's wife was Faith's paramour.

Copeland testified that, on the day of the robbery, she, Geary, and Hailey drove Caudill's van back to Caudill's home and unloaded several of the stolen

2

items at Caudill's residence. A few days after the robbery, Geary returned to Caudill's home. When Caudill's husband returned to find Geary at his house, he told Geary to get out. Caudill's husband called police, who came to the residence. There, police recovered several items matching the description of goods stolen from Faith's home.

## II. ANALYSIS

### A. Request to test bandanas for DNA

At trial, Copeland testified she purchased several dark blue bandanas along with several black ones a few weeks before the robbery and gave one of the bandanas to Geary to use during the robbery. Copeland stated that Geary wore the bandana in an attempt to conceal his identity from Faith. She did not know what Geary did with the bandana after fleeing the scene in the borrowed van. Faith testified one of the three robbers wore a black bandana covering his face.

Police apprehended Copeland and Hailey three days after the robbery in a small car and found one black and one dark blue bandana in Copeland's purse. Before trial, Geary filed a motion for the Kentucky State Police laboratory to perform DNA tests on these two bandanas. The trial court denied his motion, because the Commonwealth did not intend to test or use the bandanas, and Geary failed to provide any basis to conclude "the results would be beneficial to his cause."

Geary argues the trial court erred in denying his request for DNA testing, as KRS 31.185(1) entitled him to the tests. That statute reads in pertinent

3

part: "[a]ny defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth." While we agree that this statute entitles the defense to the same use of state facilities afforded the Commonwealth, we disagree with Geary's contention that the trial court erred in denying his request. Neither the Commonwealth nor the defense has unfettered access to the State Crime Laboratory, as dictated by Rules of Procedure, limited resources, and common sense.

We note at the outset that "[t]he Rules of Civil Procedure shall be applicable in criminal proceedings to the extent not superseded by or inconsistent with these Rules of Criminal Procedure." RCr 13.04. Because it is neither superseded by nor inconsistent with any of our Rules of Criminal Procedure, we look to CR 26.02 for guidance on this issue. Rule 26.02 provides that discoverable information must either be admissible or must "appear[] reasonably calculated to lead to the discovery of admissible evidence." In the present case, Geary failed to present any nexus between the bandanas found in Copeland's purse and the black bandana worn by the masked robber. As further explained below, because there is no evidence these particular bandanas were used in any way during the robbery, they were neither admissible at trial, nor did they appear reasonably calculated to lead to the discovery of admissible evidence.

In holding that any potential DNA evidence on the bandanas is neither admissible nor reasonably calculated to lead to the discovery of admissible

4

evidence, we turn to KRE 901(a) which reads, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." When interpreting this rule, we have said, "[p]art of the identification of evidence is a demonstration of its integrity, that it is in fact what its proponent claims it to be." *Rogers v. Commonwealth*, 992 S.W.2d 183, 187 (Ky. 1999). The text of KRE 901 "essentially codifies the old common law identification rule . . . ." *Barth v. Commonwealth*, 80 S.W.3d 390, 402 (Ky. 2001). Under that rule, when identifying or authenticating evidence, trial courts should consider whether the matter in question is sufficiently connected by time, place, and circumstance to the underlying charge to prove the matter asserted by the proponent of the evidence. *See Higgins v. Commonwealth*, 134 S.W. 1135 (1911). We have applied the common law identification rule to KRE 901. *See Davis v. Commonwealth*, 147 S.W.3d 709, 728 (Ky. 2004); *Barth*, 80 S.W.3d at 402.

We now turn to the facts of the case at bar to determine whether the bandanas were sufficiently connected by time, place, and circumstance to the underlying crime. Here, police did not recover the bandanas from the scene of the robbery. Three days passed before police confiscated two bandanas, one black and one dark blue, from Copeland's purse. Copeland and her purse were in a different vehicle than used in the robbery. In this case, the only particularized characteristic of the bandana used in the robbery was its black color. Copeland testified she bought "several" dark blue and black bandanas a

5

few weeks prior to the robbery, gave one to Geary before the robbery, and did not know what Geary did with that bandana afterward. Geary, as proponent of the evidence, failed to offer any explanation of the nexus between the bandanas recovered from Copeland's purse and the bandana used in the robbery.

The Commonwealth did not seek to introduce the bandanas into evidence. As the party seeking to have the bandanas tested for DNA, it was incumbent upon Geary to offer something of substance to support the proposition that one of the bandanas he sought to have tested was the one used in the robbery. However, he failed to present a sufficient connection to the robbery or show his verdict or sentence would have been more favorable if the court had ordered the DNA testing. The bandanas' connection in time, place, or circumstance to the underlying crime are remote and lack any probative value. Without a reasonably probable nexus connecting the confiscated bandanas to the bandana used in the robbery, Geary lacks any basis to establish the DNA testing would further his cause. Geary failed to establish the trial court erred in denying his motion to have the Kentucky State Police Laboratory test the bandanas for his DNA.

For the aforementioned reasons, DNA testing of the bandanas would not have been admissible, nor did it appear reasonably calculated to lead to the discovery of admissible evidence. This would have been true no matter which party sought the testing. For this reason, the trial court was correct in denying Geary's motion to have the bandanas tested pursuant to KRS 31.185(1).

## B. Alternate Perpetrator

Geary contends the trial court deprived him of his constitutional right to present a defense by denying him the opportunity to present alternate perpetrator evidence through his own testimony. Geary wanted to testify that Jeff Springer actually committed the robbery. Geary posits Springer wanted to frame him because Geary provided testimony in an unrelated murder case years prior to the robbery in question.

For Geary's alternate perpetrator theory to be plausible, Springer had to manipulate his pawns so skillfully as to deserve the title of Grandmaster. First, Springer had to convince both of Geary's co-defendants to commit a crime that could land them back in prison. Second, Springer had to come up with a script for the masked robber to tell Faith that the robbery was what he got for messing with a married woman. Third, Springer had to convince Geary's co-defendants to implicate Geary, rather than Springer. Fourth, Springer had to convince the co-defendants to plead guilty and accept a sentence with significant prison time. Fifth, Springer had to convince them to lie under oath that Geary was the masked robber. Sixth, Springer had to convince Geary to accept items stolen from Faith's home. Finally, Springer had to collude with Lola Caudill's husband to startle Geary to such an extent Geary would leave the Caudill's residence without taking the items stolen from Faith's home.

Under our case law at the time of Geary's trial, a defendant was required to show both motive and opportunity before asserting an alternate perpetrator

7

defense. However, in a recent case, we clarified that showing motive and opportunity to commit the crime was but one way to get an alternate perpetrator defense admitted. In *Gray v. Commonwealth*, we stated, "[a]t its heart, the critical question for [alternate perpetrator] evidence is one of relevance: whether the defendant's proffered evidence has any tendency to make the existence of any consequential fact more or less probable." 480 S.W.3d 253, 267 (Ky. 2016). We thus departed from the line of cases following our decision in *Beaty v. Commonwealth*, 125 S.W.3d 196, 202 (Ky. 2003), requiring a defendant show both the motive and opportunity of an alternate perpetrator to commit the underlying crime. We held, "[e]ssentially, the balancing test found in KRE 403 is the true threshold for admitting [alternate perpetrator] evidence; *Beaty* and its progeny are simply this Court's way of guiding the trial court in assessing the probative value of prospective [alternate perpetrator] theories." *Gray*, 480 S.W.3d at 267.

In clarifying KRE 403's application, we said what the rule requires "is evidence of some logical, qualifying information to enhance the proffered evidence beyond speculative, farfetched theories that may potentially confuse the issues or mislead the jury." *Id.* at 268. In making this determination, "[w]e show great deference to a trial court's evidentiary rulings and reverse only upon a finding of an abuse of discretion. So the trial court's ruling on this issue will be affirmed absent a showing that the trial court's ruling was arbitrary, unreasonable, unfair, or unsupported by legal principles." *Id.* at 266-267 (internal quotations and citations omitted). As mentioned, the trial

8

court ruled on this issue before this Court rendered our opinion in *Gray*. Irrespective of the trial court's rationale, we now examine its determination under the *Gray* standard.

In evaluating whether the trial court abused its discretion, we must determine whether its decision to exclude alternate perpetrator testimony was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. The trial court must weigh to what extent an alternate perpetrator defense makes other evidence more or less probable against its potential to mislead the jury or confuse the issues.

One manner for a trial court to balance these competing issues is to determine whether the alternate perpetrator has any links to the crime independent of the defendant's own assertion. Doing so ensures an alternate perpetrator defense affects the tendency to prove other evidence, while also ensuring the alternate perpetrator defense is not smoke-and-mirrors intended to mislead the jury. Without a reasonable nexus linking the alternate perpetrator to the crime, a proffered theory of ill will remains too speculative to be relevant because of the potential to confuse the issues or mislead the jury.

Geary does not assert any independent connection between Springer and the robbery or victim, nor does he assert Springer had the opportunity or motive—apart from Geary's contention Springer wanted to frame him. Geary's proffered testimony that Springer framed him is too remote and disconnected and does nothing more than raise a conjectural inference Springer had the motive to commit the underlying crime because he wanted to frame Geary.

Geary does not allege Springer and Faith ever met, much less knew one another, nor does Geary provide any information showing that Springer was in the area of Faith's home on the day of the robbery. While not dispositive, these basic connections acquire more importance because Geary did not offer any other facts establishing a reasonable nexus between Springer and the robbery.

In the absence of these facts, Geary's theory failed to meet the KRE 403 balancing test. The trial court's ruling was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles. Therefore, we hold the trial court did not abuse its discretion in denying Geary's alternate perpetrator defense.

### C. Prior Statement

The trial court did not err in denying Geary an opportunity to impeach a witness on a collateral issue because the statement in question was not inconsistent. Before invoking KRE 613(a) regarding a prior inconsistent statement, the statement in question must actually *be* inconsistent. This rule of evidence applies *after* the proponent of the motion establishes an actual inconsistent statement.

Geary argues the trial court improperly prevented him from impeaching a witness—specifically, Copeland. He contends Copeland's testimony at trial regarding the location at which she changed clothes en route to the robbery differed from what she had told police. When police took Copeland's statement, they did not ask her where she changed into the dress she wore when she committed robbery. At trial, when specifically asked by the Commonwealth if she changed into the dress while in the van en route to Faith's house, she

10

replied affirmatively. On cross-examination, Geary asked if she told police she changed in the van. Copeland testified she assumed she told this to police when they took her statement.

Copeland's testimony that she assumed she told police something (which it turned out they had not even asked her) is appreciably different from her giving the police a statement regarding a certain fact, then testifying at trial to something different or that she did not remember it. Ultimately, testimony that Copeland assumed she told something to police in a statement about where she changed into the dress is an immaterial collateral issue. Geary does not assert Copeland ever told anyone she changed into the dress anywhere other than the van. We hold the trial court did not err by denying Geary the opportunity to impeach Copeland for a prior inconsistent statement because her statement was not inconsistent.[1]

## D. Testimony of Parole Officer During Sentencing Phase

Geary objected when a parole officer testified she did not know whether a violent offender is eligible to receive good-time credit. At a bench conference, the Commonwealth agreed to cure any defect through further questioning of the officer and Geary consented. Geary did not further object after the Commonwealth returned to question the witness as agreed. Any alleged error was not preserved, as Geary did not renew his objection and did not apprise

---

[1] Geary filed a motion to supplement the record with transcripts of Copeland's interview. We have considered that motion and deny it as moot based on our holding herein.

11

the trial court that he did not believe the Commonwealth's additional questions cured any possible defect.

Even if we were to assume the trial court erred, said error would not be palpable. The violent nature of the home invasion and Geary's extensive criminal history more likely contributed to the jury's recommended sentence than the parole officer's testimony that she was unsure whether Geary was eligible for good-time credit.

This Court has said, "an unpreserved error may be noticed on appeal only if the error is palpable and affects the substantial rights of a party, and even then relief is appropriate only upon a determination that manifest injustice has resulted from the error." *Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009)(internal citations and quotations omitted). Manifest injustice occurs when "the error so seriously affect[s] the fairness, integrity, or public reputation of the proceeding as to be shocking or jurisprudentially intolerable." *Jones*, 283 S.W.3d at 668 (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006).

We have held, "[t]he use of incorrect, or false, testimony by the prosecution is a violation of due process when the testimony is material." *Robinson v. Commonwealth*, 181 S.W.3d 30, 38 (Ky. 2005). However, in this case, the officer's testimony was not incorrect or false. At one point during questioning, Geary asked whether any credits can reduce a violent offender's sentence below eighty-five percent. The officer responded she was unsure. A bench conference ensued. Afterward, the Commonwealth asked the officer

12

whether good-time credit applies to a violent offender. Again, the officer responded she was unsure. The officer went on to testify that credits do not go toward parole eligibility, insofar as to the service of eighty-five percent of the sentence. The officer's later testimony cured any defect to the extent one existed. A witness answering truthfully she is unsure based on the context or way in which the question was asked is preferable to incorrect or false testimony.

The circumstances surrounding this officer's testimony are appreciably different from cases in which we reversed the sentences. For example, in *Robinson*, the officer's testimony was false or incorrect and the Commonwealth repeated the incorrect information in closing. Here, the officer's testimony was not incorrect, she merely stated she was unsure. After a bench conference, the Commonwealth asked further questions to clarify her answers to which Geary did not object.

The jury could have recommended a sentence ranging from twenty years' imprisonment to life; instead, it recommended Geary be sentenced to thirty years, ten years above the minimum. Based on Geary's substantial criminal history, the violent nature of the home invasion—including entering a home under false pretenses, hog-tying the victim, and holding a gun to the victim's head while he watched his home being ransacked—likely influenced the jury's recommendation. It is unlikely that a parole officer's testimony she was unsure whether Geary would be eligible for parole before serving eighty-five percent of his sentence substantially prejudiced Geary, especially considering

13

the Commonwealth subsequently clarified the statement to Geary's satisfaction as evidenced by his lack of further objection.

Because of the other evidence heard by the jury, the testimony, if it was error, was no more likely than ordinary error to affect the judgment in this case. A thirty-year sentence recommendation is not shocking or jurisprudentially intolerable under these facts. In no way does a thirty-year sentence recommendation for this conviction call into question the fairness, integrity, or public reputation of the courts.

### III. CONCLUSION

For the aforementioned reasons, we affirm Geary's convictions and corresponding sentences and deny his motion to supplement the record with Copeland's transcripts as moot.

All sitting. Minton, C.J.; Hughes, Keller, Venters, Wright, JJ., concur. Cunningham, J., concurs in result only by separate opinion. Noble, J., concurs in result only by separate opinion.

CUNNINGHAM, J., CONCURRING IN RESULT: I agree in the result of this excellent opinion. However, I believe that the Appellant should have been allowed to testify concerning Jeff Springer wanting "to frame him because Geary provided testimony in an unrelated murder case years prior to the robbery in question." However, such error was harmless.

NOBLE, J., CONCURRING IN RESULT: Under KRS 31.185, an attorney representing an indigent criminal defendant is "entitled to use the same state facilities for the evaluation of evidence as are available to the attorney

14

representing the Commonwealth." The statute places no explicit limit on that right. Nonetheless, the majority applies both the criminal rules related to discovery and the evidentiary rules related to authentication to the statute to reason that access to state facilities is limited to situations that are likely to result in the discovery of relevant evidence. From this, the majority concludes that there was no error in denying Geary access to state facilities to have DNA testing done on the bandana. I must respectfully disagree with the approach.

As I've already noted, the statute includes no express limit on a defense attorney's access to state facilities. The statute instead literally entitles them to access. The rules of criminal procedure and evidence have no bearing on what the statute means or what rights it grants to attorneys defending indigent defendants. The very purpose of the statute is to level the evidentiary playing field, allowing defendants of little means to compete with the might of the state. It does so by granting publicly provided defense attorneys the same access to state facilities that the state itself has.

Implicit in this is a limit of course: a defense attorney may have items tested only to the same extent that a prosecutor may do so. Thus, the statute would not allow a defense attorney to have evidence wholly unrelated to a case tested (e.g., DNA in the attorney's own paternity action), just as a prosecutor would not be entitled to such personal use of state facilities. Of course that would be waste, fraud, and abuse.

But such personal use, or use unconnected to the defendant's case, is not what was proposed in this case. The defense attorney wanted evidence

tested that the police had collected in the course of its investigation. There is no question that the evidence was related to the case.

Had the Commonwealth sought testing of this evidence, no one would question the propriety of such action. And had such testing revealed the presence of Geary's DNA on one of the bandanas, there is little question that the Commonwealth would have sought to use that evidence against Geary. To the extent that the Commonwealth *could* have properly tested the evidence, Geary should be allowed the same opportunity. Indeed, the statute *entitles* his lawyer to such access. Thus, I can only conclude that it was error for defense counsel to have been denied access to state facilities.

It is no answer that the trial court had discretion to deny Geary's motion to have the items tested. The only reason he had to move the court for such an order is that the bandanas were in the Commonwealth's custody. Had Geary wanted evidence tested that was in his possession, he would not have needed a court order. If a state facility were to deny testing in such circumstances, it would be acting in contravention of the statute, and resort to a court order might then become necessary. But again, such an order should not be necessary, absence questions about the propriety of the testing (such as that it was unrelated to the case at all). To the extent that Geary's counsel did ask for a court order and was denied one, it was error for the court to deny the motion.

The question, then, is whether the error was harmless. Geary's primary defense was that another person committed the crime and that he had been framed. He sought DNA testing of the bandana in the hopes that his alleged

alternative perpetrator had in fact been wearing one of them. Had the testing shown such results, that evidence would have been support for Geary's defense theory of alternative perpetrator.

But Geary was also limited by the trial court in how much explanation he could make about his rationale for blaming an alternative perpetrator, which also gives me some concern, but not to the level that I can say the trial court abused its discretion. Here, he sought the DNA testing as part of the *investigative* process in crafting his alternative perpetrator defense leading into the trial. Of course his approach at that point was speculative. That is the whole point of investigation: to find out what happened. It necessarily requires speculation or, to use a kinder word, hypothesizing, and subsequent testing of any hypotheses to determine if they present a viable theory of the case. If we knew beforehand what the evidence would show, testing would be unnecessary. Thus, that Geary's counsel was "speculating" about the bandana also is no answer.

The harmless error rule requires us to "disregard any error or defect in the proceeding that does not affect the substantial rights of the parties." RCr 9.24. We have further interpreted this rule to mean that an error is harmless "if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error." *Winstead v. Commonwealth*, 283 S.W.3d 678, 689 (Ky. 2009) (citing *Kotteakos v. United States*, 328 U.S. 750 (1946)). If the error had a "substantial influence" on the jury or "or if one is left in grave doubt, the conviction cannot stand." *Id.* (quoting *Kotteakos*, 328 U.S. at 765).

17

Here, because the testing was disallowed, we do not know if there was evidence to support Geary's alternative perpetrator defense on the bandana. To do harmless error analysis, we must assume that there would have been evidence that Springer had worn the bandana. If he had, what would be the effect? If Geary had been allowed to fully develop his alternative perpetrator theory, this evidence would support that Springer at least had the opportunity to have been the perpetrator. Coupled with everything Geary wanted to prove about his claim of alternative perpetrator, this could have shored up that claim.

But, standing alone, Springer's DNA on the bandana is not exculpatory, because it does not rule out Geary as wearing a different black bandana to commit the crime. Consequently, when weighed against the strength of the evidence against Geary, I cannot say that had Springer's DNA been on the bandana, and had such evidence been admitted, that it would have substantially affected the verdict. Therefore, I concur in result.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer, Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear, Attorney General
Jeffrey Ray Prather, Assistant Attorney General